UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NICOLE MARIE HARVIE,

       Plaintiff,

       v.                                                Case No. 18-C-1572

ANDREW M. SAUL,
Commissioner of Social Security,

       Defendant.

**DECISION AND ORDER**

Plaintiff Nicole Marie Harvie filed this action for judicial review of a decision by the Commissioner of Social Security denying her applications for disability insurance benefits under Title II and supplemental security income under Title XVI of the Social Security Act. Harvie argues that the administrative law judge's (ALJ) decision is flawed and requires remand because the ALJ (1) failed to follow the treating source rule in evaluating her physician's medical opinion, (2) selectively minimized Harvie's physical limitations, and (3) improperly took administrative notice of certain vocational data. For the reasons that follow, the decision of the Commissioner will be reversed and remanded.

**BACKGROUND**

Harvie filed an application for a period of disability and disability insurance benefits on May 1, 2014, and an application for supplemental security income on July 23, 2014. R. 18. Harvie claims her disability began on June 28, 2013. She listed degenerative disc disease, arthritis, spinal degeneration, arthritis in her cervical spine, bulging disks in her cervical and thoracic spine, and severe nerve damage in her right arm as the medical conditions that limited

her ability to work. R. 277. After her applications were denied initially and on reconsideration, Harvie requested a hearing before an ALJ. On August 25, 2017, ALJ John Dodson conducted a video hearing where Harvie, who was represented by counsel, and a vocational expert (VE) testified. R. 18.

At the time of the hearing, Harvie was unemployed and lived in Milwaukee, Wisconsin, with her eighteen-year-old daughter. R. 40–44, 53. She has a high school education and last worked at the Sampson Family Jewish Center (Sampson Center) for nine years where she held various roles, including as the health recreation and fitness secretary and customer service director. R. 41. At the Sampson Center, she managed 24 full time or part time employees and three desks. *Id.* She also previously worked at a nursing home for four years where she worked as a hospitality aid, in human resources, and as an admissions assistant. R. 42.

Harvie began to experience physical difficulties while working at the Sampson Center. R. 43. Her symptoms included shooting pain through her lower legs, back pain behind her shoulder blade, and shooting pain down her arms. *Id.* She received epidural injections, physical therapy, and massage therapy at the Sampson Center, where an Aurora Health Care center was located. R. 43–45. Before Harvie stopped work at the Sampson Center on June 28, 2013, her employer provided her with several accommodations so that her office was physically suited to her: a hands-free telephone headset, an ergonomic computer mouse and keyboard, and a specialized chair and computer screen. R. 44–45. The Sampson Center also offered Harvie a flexible work schedule, allowing her to arrive late and stay late to finish her job. R. 45. Harvie was placed on medical leave despite these accommodations because she became unable to work through the entire day; she estimates her productivity declined to about 10 percent of the productivity level she started with at the Sampson Center. R. 46.

2

By the time Harvie's employment ended at the Sampson Center, she was receiving narcotic pain medication. R. 47. Her primary care physician was Dr. Kim A. Merriman and she saw a separate doctor for pain management. R. 25, 47. Dr. Merriman eventually referred Harvie for a neurosurgical evaluation and she underwent a two-level cervical fusion in September 2014. R. 48–49. After this operation, the pain on Harvie's right side initially subsided, but she began experiencing pain on her left side. R. 48.

When asked what difficulties she would encounter with a much simpler job than her role at the Sampson Center, Harvie testified that she cannot perform repetitive movements for over thirty minutes and can tolerate walking for about 10 minutes and sitting for about two hours. R. 49–50. Harvie experiences pain while sitting, standing, and walking and moving her arms, head, neck, and lower back. R. 50. Nerve damage causes Harvie spasms that result in her dropping objects and throwing things. R. 51. Because it is difficult for her to hold a pen or pencil, simple writing that used to take 13 seconds now requires five minutes. *Id*. On a bad day, Harvie spends most of the day in bed, only leaving to use the bathroom. R. 52–53. On a good day, Harvie sits up and may be driven to her mom's house or the gas station. R. 53.

A week before the hearing, Harvie saw a new psychiatrist who diagnosed her with bipolar disorder. R. 54–55. She takes Vraylar for depression and Morphine and Oxycodone for pain. R. 55. Harvie continues with physical therapy, which provides temporary relief, but it also causes pain and requires her to lay down afterwards. R. 52.

In a thirteen-page decision dated October 26, 2017, the ALJ concluded that Harvie is not disabled. R. 19–31. The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA). At step one, the ALJ found that Harvie met the insured status requirements of the Social Security Act through December 31,

2018, and had not engaged in substantial gainful activity since June 28, 2013, the alleged onset date. R. 21. At step two, the ALJ determined that Harvie had the following severe impairments: degenerative disc disease/spine disorders, obesity, depression, and anxiety. *Id.* At step three, the ALJ concluded that Harvie did not have an impairment or combination of impairments that met or medically equaled the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 21–22.

The ALJ then assessed Harvie's RFC, finding that she can perform sedentary work with the following limitations:

> she must not climb ropes, ladders, or scaffolds with the ability to perform the remaining posturals' occasionally (climb ramps and stairs, balance, stoop, kneel, crouch or crawl). The claimant is limited to unskilled work with simple, routine, and repetitive tasks with no production like standards and no work with the public.

R. 23. At step four, the ALJ found that Harvie is unable to perform any past relevant work (as an admitting clerk, membership secretary, and customer service manager), but that there existed a significant number of jobs in the national economy that Harvie could perform. R. 27. The ALJ asked the VE to testify about jobs in the national economy given Harvie's age, education, work experience, and RFC; the VE testified that Harvie would be able to perform as a driver and delivery service worker/escort vehicle driver, as a general office clerk/document preparer, and other representative occupations. R. 28. Accordingly, at step five, the ALJ concluded that Harvie was not disabled. R. 30. The Appeals Council denied Harvie's request for review, making the ALJ's decision the final decision of the Commissioner.

## LEGAL STANDARD

The question before the court is not whether the judge reviewing the case thinks the plaintiff is disabled. Judicial review of the decisions of administrative agencies is intended to be

4

deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Supreme Court recently reaffirmed that "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Beistek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id*. "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the

5

rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Weight Afforded to Treating Source Opinion

Harvie argues that the ALJ's decision failed to follow the treating source rule and did not give controlling weight to the opinion of her treating physician, Dr. Kim Merriman. The ALJ gave little weight to Dr. Merriman's opinions, finding they were not supported by other evidence in the record and did not support a finding of disability. R. 25–26. The ALJ noted that Dr. Merriman observed Harvie's declining functionality and opined that Harvie was unable to work due to her condition and medications. R. 25. However, the ALJ concluded that while Harvie "experienced tenderness, pain, stiffness, and radiation, and, at times, her range of motion in the lumbar and cervical spines were decreased . . . she was consistently neurologically intact and her gait, strength, reflexes, sensation, balance, coordination, motor function, and range of motion in the lumbar and cervical spines and all four extremities were consistently within normal limits." *Id*.

Generally, the medical opinion of a treating physician on the nature and severity of an impairment is given "controlling weight" if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010); 20 C.F.R. § 416.927(c)(2); SSR 96-2p; *see also Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). If the ALJ decides to give lesser weight to a treating physician's opinion, he must articulate "good reasons" for doing so. *Larson*, 615 F.3d at 749. Stated differently, although an ALJ is not required to give the treating physician's opinion controlling weight, he is still required to provide a "sound explanation for his

decision to reject it." *Roddy*, 705 F.3d at 636 (citations omitted). "If the ALJ does not give the treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *see also* 20 C.F.R. § 404.1527. The ALJ is not required to "explicitly weigh every factor." *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 414–16 (7th Cir. 2008). Instead, the ALJ need only "sufficiently account for the factors." *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013).

Harvie asserts that the ALJ's findings improperly ignore Dr. Merriman's September 20, 2016 physical capacities statement and the factors outlined by § 404.1527. In the physical capacities statement, completed on September 20, 2016, in connection with Harvie's application for W-2 placement, Dr. Merriman stated that Harvie could "never" look down, turn her head right or left, stoop, crouch/squat, climb ladders, or climb stairs and "rarely" look up or hold her head in a static position. R. 843–44. Dr. Merriman also observed that Harvie's symptoms would "frequently" interfere with simple work tasks, that she was not making positive progress, and would be absent from work more than 3 times per month. R. 844. In a signed acknowledgement letter to Harvie's counsel, Dr. Merriman stated that he continued to support the conclusions he authored in this September 2016 physical capacities statement as of August 31, 2017. R. 1025.

The ALJ did not cite the capacities assessment that Dr. Merriman authored in September 2016 and certified was current as of August 2017. ALJs are "not permitted to cherry-pick evidence from the record to support their conclusions, without engaging with the evidence that weighs against their findings." *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018). Despite

7

the many citations to the record in the ALJ's decision, there are no references to Exhibits 12F or 20F, containing Dr. Merriman's September 2016 physical capacities statement and related certification. R. 843, 1025. And while the ALJ repeated three times that Harvie was "consistently neurologically intact and her gait, strength, reflexes, sensation, balance, coordination, motor function, and range of motion in the lumbar and cervical spines and all four extremities were consistently within normal limits," he did not address Dr. Merriman's opinion that she could "never" look down or turn her head right or left, among other findings in Exhibit 12F. Dr. Merriman's opinions related directly to Harvie's range of motion. The ALJ's lone reference to Harvie's neck noted that it showed "decreased range of motion," which he countered with findings that she was otherwise "neurologically intact . . . ." R. 24. How was Harvie to perform as a delivery driver if her doctor advised she could not look left or right and would miss work three times per month? Neither the ALJ nor the VE discussed this. The ALJ's decision lacks good reasons for not considering Dr. Merriman's most negative findings.

The ALJ's decision contains other examples of selective citation. Twice, in paragraphs of his decision where he discusses Harvie's physical symptoms, the ALJ notes Harvie's reported "bright" affect and "happy" mood (both times citing the same evaluation with a mental health therapist in February 2017 at Shorehaven Behavioral Health Inc.). R. 25, 26, 922. The ALJ glosses over, however, that this same therapist observed that Harvie's anxiety was caused by her inability to work due to pain and that she has an arm that "feels numb, ice cold and has shooting pains." R. 922. This therapist's evaluation of Harvie's mood seems to be used by the ALJ to offset conclusions of Harvie's physical symptoms. If anything, the rest of the evaluation— selectively cited by the ALJ—corroborates Dr. Merriman's conclusions and Harvie's physical symptoms.

8

It may be true that the ALJ could have reached the same conclusion regarding Harvie's alleged disability had he weighed this evidence in light of the entire record, but we do not know. The finding by Harvie's long-term treating physician that Harvie could "never" perform various physical movements ties directly to her alleged impairment. It should have formed some part of the ALJ's reasons for discounting her doctor's controlling opinion. By failing to weigh what appears to be the most critical findings, I find the ALJ did not give good reasons for the weight he accorded Dr. Merriman's opinions in relation to the substantial evidence in the record. Reversal and remand is warranted on these grounds.

## B. Administrative Notice of Occupational Data

Harvie argues that the ALJ improperly took administrative notice of job statistics the VE cited from U.S. Publishing's OCCUPATIONAL EMPLOYMENT QUARTERLY (OEQ). When asked what statistical sources the VE used to determine the number of sedentary jobs in the national economy during the hearing, the VE testified that he relied upon base-line numbers from the U.S. Department of Labor (Bureau of Labor), in addition to numbers from SkillTran (a forensic career database program) and U.S. Publishing. R. 60. He also noted that there is no single source that calculates job numbers by physical exertion level and stated that the two software programs (U.S. Publishing and SkillTran) use the Bureau of Labor's statistics as their data source. R. 60–61. Harvie's counsel objected to the ALJ's administrative notice of the VE's figures derived from U.S. Publishing in a letter to the ALJ following the hearing. R. 426.

Harvie contends that VEs routinely use vocational resources "based on discredited methodologies." Pl.'s Br. at 10, Dkt. No. 12. She argues that "U.S. Publishing's primary product, a publication called *Occupational Employment Quarterly* was one such source—having been described as 'unacceptably crude' by the Seventh Circuit," citing *Browning v. Colvin*, 766 F.3d

9

702 (7th Cir. 2014). R. 426; Pl.'s Br. at 10. *Browning* addressed a specific methodology, however. It did not refer to the OEQ or U.S. Publishing by name. Instead, it dealt with the DICTIONARY OF OCCUPATIONAL TITLES, a publication of the Department of Labor, and the VE's "method of dividing the number of jobs in some large category (which may be the only available data) by the number of job classifications in the category." 766 F.3d at 709. And, contrary to Harvie's characterization, the Seventh Circuit has separately observed that OEQ "does indeed seem to be a source on which VEs customarily rely." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009); *see also Arms v. Berryhill*, No. 18-CV-476-JDP, 2019 WL 1352809, at *6 (W.D. Wis. Mar. 26, 2019) (finding the ALJ elicited testimony to show job numbers derived from the OEQ were the "product of a reliable method" (citations omitted)).

During Harvie's hearing, counsel questioned the VE about his methodology. He asked the VE if the job numbers identified by exertion-level were "based on extrapolation," and the VE replied affirmatively and indicated that U.S. Publishing provided the extrapolated number. R. 62. Counsel again confirmed that the VE relied "upon US Publishing or whatever extrapolation methodology they use to report" the number of office clerk and document preparation jobs that fit the stated classifications. R. 63. Counsel did not inquire further. The hearing transcript does not show that the VE discussed dividing the number of jobs in a larger category by the number of job classifications in the category itself. Instead, he testified that U.S. Publishing provided the job figures identified by exertion level.

As the record shows, when Harvie's counsel did question the VE on his calculations, he made no inquiry as to the extrapolation methodology beyond confirming the VE used extrapolation. He made no objection to the extrapolation method itself. He thereby forfeited the opportunity to raise an objection before the ALJ and further question the VE at the hearing.

10

Instead, counsel raised it belatedly in a post-hearing letter to the ALJ and in Harvie's appeal brief. *See Donahue v. Barnhart*, 279 F.3d 441, 447 (7th Cir. 2002) ("Raising a discrepancy only after the hearing . . . is too late. An ALJ is not obliged to reopen the record.").

Harvie also asserts that the ALJ's discussion of the OEQ constituted gross abuse of administrative notice. The regulations provide that the ALJ "will take administrative notice of reliable job information available from various governmental and other publications," and includes five examples of such government publications. 20 C.F.R. § 416.966(d). Harvie argues that the ALJ improperly waited until after the hearing to note that he was taking judicial notice of the OEQ. Pl.'s Br. at 20. Plaintiff cites no authority, however, requiring the ALJ to alert the parties that he is taking administrative notice before doing so in his decision. Counsel had the opportunity to object to the discussion of the OEQ by the VE and its inclusion in the record at the hearing and did not do so. Harvie also argues that the OEQ "is not one of the resources that 20 C.F.R. § 416.966(d) holds out as having been the subject of administrative notice." Pl.'s Br. at 19–20. But the regulation does not provide an exclusive list, merely examples. It also specifically provides that the ALJ will rely on job information from "other publications." It follows that it is not a gross abuse of administrative notice for the ALJ to take notice of a source that provides occupational data in accordance with 20 C.F.R. § 416.966(d) and the examples provided therein.

In any event, Harvie has not shown that the ALJ's reliance on the OEQ resulted in reversible error. The ALJ concluded that the occupational data provided by the VE amounted to a significant number of jobs in the economy. R. 29. Even if the VE's extrapolations were off by 90 percent, they would still exceed the number of jobs that courts have upheld as a significant number. *See Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (collecting cases that have found

anywhere from 174 to 1,350 positions to be a "significant" number of jobs). I therefore find no error in the use of the OEQ figures by the ALJ in this manner.

## CONCLUSION

For these reasons, the decision of the Commissioner is **REVERSED and REMANDED** to the SSA pursuant to 42 U.S.C. § 405(g) (sentence four) for further proceedings consistent with this order. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 23rd day of March, 2020.

s/ William C. Griesbach
William C. Griesbach, District Judge
United States District Court